UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

EDWARD DEMIRDJIAN,

                Petitioner,

       - against -

T. GRIFFIN,

                Respondent.

**<u>ORDER</u>**

17 Civ. 4547 (PGG) (SN)

PAUL G. GARDEPHE, U.S.D.J.:

        Edward Demirdjian has filed a <u>pro se</u> petition for a writ of habeas corpus.  (Dkt. No. 1)  Magistrate Judge Sarah Netburn has issued a 23-page Report and Recommendation ("R&R") recommending that the Court deny the petition and deny Demirdjian leave to supplement his original petition.  (Dkt. No. 41)  For the reasons stated below, this Court will adopt the R&R in its entirety, and Demirdjian's petition will be denied.

## <u>BACKGROUND</u>

### I.    <u>THE EVIDENCE AT TRIAL</u>

        Demirdjian was charged with murder in the second degree and criminal possession of a weapon in the second degree after the shooting of Sherra Morganstern, the mother of his child.  (R&R (Dkt. No. 41) at 2)

        Demirdjian and Morganstern had been living together with their child – Shakira – in Florida until late 2007 or early 2008, when Morganstern moved to New York.  (Trial Tr. at 56-57, 71-72)  In the summer of 2008, Morganstern's friend Marva Puerto informed Demirdjian that Morganstern was planning to come to Florida to retrieve Shakira.  Demirdjian told Puerto, "no, she's not getting the baby. Before she ever gets the baby she'll be dead. I will kill her."  (<u>Id.</u> at 77-78)  In April 2009, Demirdjian purchased a handguan.  (<u>Id.</u> at 504, 509)

On July 26, 2009, Demirdjian brought Shakira to the home of his nephew, and asked that the nephew and other family members care for Shakira while Demirdjian traveled to Mississippi for business.  (Id. at 627-28, 633-34)  The next evening, however, Demirdjian told the director of Shakira's day care center that he was travelling to New York "to handle business with Shakira's mother," and that his family would care for Shakira while he was away.  (Id. at 574-75)  Cellular tower records indicate that on July 26 and 27, 2009, Demirdjian's cell phone traveled through South Carolina, the District of Columbia, Baltimore, and Philadelphia, and into Manhattan, arriving on the evening of July 27, 2009.  (Id. at 475-80)

Morganstern lived with her mother in Manhattan.  On July 30, 2009, after a four-day hospital stay, Morganstern's mother returned to their apartment.  She found Morganstern shot to death, lying in her bed.  A neighbor reported hearing gunshots in the early morning hours of July 27 or 28, 2009.  An autopsy indicated that Morganstern had died in the early morning hours of July 28, 2009.  (Id. at 96, 99-101, 122-23, 216-19,1067, 1072, 1099-1100)

In early August 2009, Demirdjian's brother travelled to the Baltimore area to recover Demirdjian's broken-down minivan.  He found two or three unspent bullets inside the minivan.  (Id. at 729-32)

On August 10, 2009, Demirdjian made the first of several calls to SBLI Mutual Life Insurance to inquire about receiving proceeds from Morganstern's $250,000 life insurance policy, of which he was sole beneficiary.  (Id. at 515, 518, 526-27)

On August 11, 2009, detectives of the New York City Police Department ("NYPD") contacted Demirdjian at his apartment in Orlando, Florida.  After the detectives administered Miranda warnings, Demirdjian agreed to be interviewed, and he ultimately signed written statements memorializing the interview.  (Id. at 1044-51, 1118-19, 1123, 1127-28, 1130-

31)  During the interview, Demirdjian confirmed that his cell phone was in his possession during the period between July 26 and July 30, 2009, and that he had used it during that time. Demirdjian claimed that he had remained in Florida throughout this period, because his car broke down.  (Id. at 1052-53)  When shown records pertaining to his cell phone, Demirdjian claimed that he had planned to travel to New Jersey to surprise his brothers, but his car had broken down near Baltimore, and he had not been able to travel any further north.  Demirdjian specifically denied travelling to New York.  (Id. at 1125-31)

Demirdjian also told the detectives that Morganstern had sent him a text message on July 26 or 27, 2009, in which she wrote, "If anything happens to me, give my love to my daughter Shakira."  (Id. at 1118-19, 1123)  Demirdjian later showed the detectives this text message, which was stored on his cell phone.  The date stamp for the text message indicated that it had been sent in late June 2009, and not on July 26 or 27, 2009, as Demirdjian had represented. With Demirdjian's permission, the detectives took photographs of the text message, which were introduced at trial.  (Id. at 776-77)

Demirdjian left his Orlando residence in October 2009, leaving the keys to his apartment with his sister.  She asked her son – Demirdjian's nephew – to clean his apartment, which the family planned to sell.  While cleaning the apartment on October 29, 2009, the nephew found a gun, a gun case, ammunition, and gloves on the kitchen counter.  (Id. at 636-38, 646-49) The nephew contacted the police and let them into the apartment.  Detectives recovered a Glock .357 caliber semi-automatic handgun, two loaded firearm magazines, and rubber gloves inside the apartment.  (Id. at 639, 641, 673, 687-88)  Ballistics tests showed that the bullet casings recovered from the scene of Morganstern's murder had been fired from the handgun found in

Demirdjian's apartment.  Police also found four .357 caliber bullets in Demirdjian's minivan.
(<u>Id.</u> at 812, 834, 857-58, 890-91, 1135-37, 1179)

## II.    THE PROSECUTOR'S SUMMATION AND THE JURY'S VERDICT

In summation, the prosecutor told the jury that the evidence was "overwhelming"; that "nothing speaks more to this overwhelming evidence than defense counsel's request that you disregard your common sense and logic"; and that the idea that "someone else is in fact the killer . . . really is absurd."  (<u>Id.</u> at 1324, 1365)  The prosecutor also characterized defense counsel's emphasis on the lack of DNA evidence as "an attempt to divert" the jury, and referred to an emotional outburst by Demirdjian during the trial as "a nice show."  (<u>Id.</u> at 1344, 1370)

The jury found Demirdjian guilty of murder in the second degree and criminal possession of a weapon in the second degree.  (<u>Id.</u> at 1412)  The court sentenced Demirdjian to an indeterminate term of 25 years' to life imprisonment on the second-degree murder charge, and to a determinate term of 15 years' imprisonment on the firearms charge.  (R&R (Dkt. No. 41) at 10)

## III.    POST-CONVICTION PROCEEDINGS

In his direct appeal, Demirdjian argued that the prosecutor's summation deprived him of a fair trial, and that his lawyer had been constitutionally ineffective in failing to adequately cross-examine a detective about where the handgun was found on the kitchen counter in Demirdjian's apartment.  (Pet. Main Direct Appeal Br. (Dkt. No. 11-1) at 9-10; Pet. <u>Pro</u> <u>Se</u> Direct Appeal Br. (Dkt. No. 11-1) at 56, 60)  On December 1, 2015, the First Department, Appellate Division, issued a decision rejecting these arguments, <u>People v. Demirdjian</u>, 134 A.D.3d 403 (1st Dept. 2015), and on July 7, 2016, the New York Court of Appeals denied leave to appeal.  <u>People v. Demirdjian</u>, 27 N.Y.3d 1150 (2016).

On April 6, 2016, Demirdjian filed a pro se motion to vacate the judgment of conviction pursuant to § 440.10 of the New York Criminal Procedure Law, arguing that his lawyer had been ineffective in failing to (1) object to the prosecutor's summation; (2) cross-examine the detective about the location of the handgun; (3) move to suppress Demirdjian's text messages with Morganstern; and (4) retain a ballistics expert.  The trial court rejected the first two claims because they had been raised and rejected on direct appeal.  The court also rejected Demirdjian's claim about the text messages, finding that there was no basis for filing a motion to suppress.  As to Demirdjian's claim about a ballistics expert, the court rejected the claim because Demirdjian had not (1) shown how the verdict would have been different had an expert been retained; or (2) submitted a supporting affidavit from his attorney.  People v. Demirdjian, No. 5971-09, slip op. at 1-4 (N.Y. Sup. Ct. Oct. 18, 2016); see also Dkt. No. 11-1 at 132-35.  On January 20, 2017, the First Department denied leave to appeal.  People v. Demirdjian, No. M-6366, 2017 WL 598218 (1st Dept. Jan. 20, 2017).

## IV.   **PROCEDURAL HISTORY**

On June 7, 2017, Demirdjian – proceeding pro se – filed the instant petition for a writ of habeas corpus.  (Pet. (Dkt. No. 1))  On July 14, 2017, the Court referred the petition to Magistrate Judge Sarah Netburn for a report and recommendation.  (Dkt. No. 7)

On April 26, 2018, Judge Netburn issued a 23-page R&R recommending that the Court deny the petition and deny Demirdjian leave to supplement his original petition.  (Dkt. No. 41)  Objections were due on May 10, 2018.  (Id. at 22-23)

On May 7, 2018, Demirdjian filed a request for a 90-day extension of time to file and serve objections to the R&R.  (Dkt. No. 42)  This Court granted his request on July 21, 2019, extending Demirdjian's deadline to file objections to September 3, 2019.  (Dkt. No. 43)

In a July 18, 2019 letter, Demirdjian submitted "correspondence from the Orange County Sheriff's Office . . . [s]howing that [he] was not in possession of the victim's keys at the time of the murder."  (Dkt. No. 45)

On August 26, 2019, Demirdjian filed six objections to the R&R, which are discussed below.  (Pet. Obj. (Dkt. No. 48))

## V.      THE PETITION

In his Petition, Demirdjian contends that (1) the prosecutor's summation deprived him of a fair trial by ridiculing Demirdjian's theory of the case and by commenting on Demirdjian's behavior at trial[1]; and (2) his trial counsel was constitutionally ineffective in not objecting to the prosecutor's summation, not retaining a ballistics expert, and in not moving to suppress the text messages found Demirdjian's cell phone.  (Pet. (Dkt. No. 1) at 2-3)

Demirdjian seeks to supplement the Petition by adding the following arguments: (1) that Respondent has committed a fraud on the court; (2) that the prosecutor violated Brady by not providing the defense with a copy of a report Demirdijian made to the police on July 25, 2009; and (3) that he is actually innocent.  (Pet. Reply Br. (Dkt. No. 35) at 7-8, 22-23)

## VI.     JUDGE NETBURN'S R&R

In her R&R, Judge Netburn finds that Demirdjian's petition is timely, noting that the one-year post-conviction period to seek relief was tolled by Demirdjian's April 6, 2016 motion to vacate the judgment pursuant to CPL § 440.10.  Demirdjian's motion "tolled the

---

[1]  During summation, the prosecutor described Demirdjian's courtroom behavior as follows:  "I feel the need to address . . . [Demirdjian's] behavior here in this courtroom.  As soon as Sherra Morganstern's picture was put up on the screen, we saw a real emotional outburst for the defendant.  He began crying for all of you.  It was a nice show."  (Trial Tr. at 1344)

limitations period until January 20, 2017, when the Appellate Division denied Demirdjian's request for leave to appeal the trial court's denial of the motion."  (R&R (Dkt. No. 41) at 13)

Judge Netburn further concludes that Demirdjian has exhausted his state remedies by raising his claims during direct appeal, in a supplemental pro se brief, in his CPL § 440.10 motion, and by seeking leave to appeal the denial of his claims.  (Id. at 14)

As to Demirdjian's claims regarding the prosecutor's summation, Judge Netburn concludes that they were procedurally defaulted, because Demirdjian made no contemporaneous objection.  (Id. at 15)  Judge Netburn also finds that these claims would, in any event, fail on the merits, because the prosecutor's summation was "well within the bounds of zealous advocacy," and "'[t]he question of whether summation commentary on a defendant's courtroom demeanor implicates constitutional rights has yet to be decided by this Court or by the Supreme Court.'" (Id. at 16-17 (quoting Maiello v. Edwards, 199 F.3d 1322, 1322 (2d Cir. 1999)))

As to Demirdjian's ineffective assistance of counsel claims, Judge Netburn concludes that "[t]he state courts' rejections of [those] . . . claims were reasonable applications of [Strickland v. Washington, 466 U.S. 668 (1984)]."  (Id. at 18)  As to counsel's failure to object to the prosecutor's summation, Judge Netburn reiterates that (1) a prosecutor's zealous advocacy does not violate a defendant's right to a fair trial; and (2) defendants have no clearly established right to bar prosecutors from commenting on their courtroom demeanor.  (Id.)  As to the failure to retain a ballistics expert, Judge Netburn finds that "Demirdjian has not explained how testimony from a ballistics expert might have strengthened his defense. . . ."  (Id.)  And as to counsel's failure to move to suppress the text messages found in Demirdjian's cell phone, Judge Netburn finds that Demirdjian "does not describe any basis for suppressing those messages," noting that "the record suggests that Demirdjian showed the text messages to police on an

entirely voluntary basis. . . ."  (Id. at 18-19)  Judge Netburn concludes that "Demirdjian has not

demonstrated that the outcome of the trial would have been any different but for counsel's

purportedly inadequate performance," noting that – even setting aside the matters about which

Demirdjian complained – "there was still ample evidence to support a guilty verdict. . . ."  (Id. at

19)

            As to Demirdjian's request to supplement the Petition, Judge Netburn made the

following findings:  With respect to Demirdjian's "fraud on the court" argument, Judge Netburn

found that he "has not explained how Respondent's description of the facts is inaccurate or

misleading.  Nor has he presented any evidence to suggest that Respondent's version of the facts

prevents the judicial system from functioning in its usual manner."  (Id. at 21)  As to

Demirdjian's Brady claim – which concerns a police report that Demirdjian himself had made on

July 25, 2009 – Judge Netburn found that this claim has not been exhausted.  Moreover,

Demirdjian "was fully aware of the essential facts permitting him to take advantage of this

evidence."  (Id.)  Finally, as to Demirdjian's actual innocence claim, Judge Netburn noted that

such a claim only "'may allow a petitioner to have his accompanying constitutional claims heard

despite a procedural bar.'"  (Id. at 22 (quoting Rivas v. Fischer, 687 F.3d 514, 540 (2d Cir.

2012)))  "Demirdjian has not demonstrated that any of his constitutional claims are meritorious,"

however, and accordingly "there would be no constitutional grounds upon which to grant him

habeas relief."  (Id.)  Given these circumstances, Judge Netburn concludes that supplementing

the Petition would be futile, and she recommends that Demirdjian's request to supplement be

denied.  (Id.)

## VII.   PETITIONER'S OBJECTIONS

            Petitioner makes six objections to the R&R.

He first contends that Judge Netburn should have given more weight to one aspect of Detective Berish's testimony concerning Demirdjian's cell phone records.  When Detective Berish was asked whether he "kn[ew] anything about [Demirdjian's] phone being on thirty-fourth Street [in Manhattan]," Berish responded, "[n]ot at the time."  (Pet. Obj. (Dkt. No. 48) at 4 (citing Trial Tr. at 1217-18))

Demirdjian next complains that Judge Netburn "failed to amend the R&R in light of the recent decision of the United States Supreme Court" in United States v. Haymond, 139 S. Ct. 2369 (2019).  (Id. at 4)

Demirdjian also objects to Judge Netburn's conclusion that there was no colorable argument in support of a motion to suppress the text messages, contending that an "evidentiary hearing was required to determine whether" defense counsel was ineffective in failing to file such a motion.  (Id. at 4-5)

Demirdjian also objects to Judge Netburn's conclusion regarding the prosecutor's summation, arguing that the state court's "application of the rule is exorbitant, rendering the [s]tate ground inadequate. . . ."  (Id. at 5-6)

Demirdjian further contends that Judge Netburn errs in concluding that he has not adequately explained how retention of a ballistics expert would have affected the outcome of the trial.  According to Demirdjian, "[i]t is axiomatic that the outcome of the trial would have been different absent the deficient performance of [c]ounsel."  (Id. at 6)  Demirdjian also contends that he has no obligation, under New York law, to submit an affidavit from his trial counsel setting forth what actions the lawyer took regarding the ballistics evidence.  (Id. at 5)

Finally, Demirdjian contends that Judge Netburn errs in recommending that he not be permitted to supplement the Petition.  (Id. at 7-8)

9

## DISCUSSION

## I.   LEGAL STANDARDS

### A.   Review of a Report and Recommendation

A district court reviewing a magistrate judge's report and recommendation "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1)(C).  When a timely objection has been made to a magistrate judge's recommendation, the district court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."  Id.  However, "[o]bjections that are 'merely perfunctory responses argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original [papers] will not suffice to invoke de novo review.'"  Phillips v. Reed Grp., Ltd., 955 F. Supp. 2d 201, 211 (S.D.N.Y. 2013) (quoting Vega v. Artuz, 2002 WL 31174466, at *1 (S.D.N.Y. Sept. 30, 2002)) (alteration in Phillips).  "To the extent . . . that the party . . . simply reiterates the original arguments, [courts] will review the Report strictly for clear error."  Indymac Bank, F.S.B. v. Nat'l Settlement Agency, Inc., 07 Civ. 6865 (LTS), 2008 WL 4810043, at *1 (S.D.N.Y. Nov. 3, 2008) (citing Pearson-Fraser v. Bell Atl., No. 01 Civ. 2343(WK), 2003 WL 43367, at *1 (S.D.N.Y. Jan. 6, 2003); Camardo v. Gen. Motors Hourly-Rate Employees Pension Plan, 806 F. Supp. 380, 382 (W.D.N.Y. 1992)); see also Ortiz v. Barkley, 558 F. Supp. 2d 444, 451 (S.D.N.Y. 2008) ("Reviewing courts should review a report and recommendation for clear error where objections are 'merely perfunctory responses,' . . . 'rehashing . . . the same arguments set forth in the original petition.'") (citing Vega, 2002 WL 31174466, at *1; Greene v. WCI Holdings, 956 F. Supp. 509, 513 (S.D.N.Y. 1997)).

For portions of the R&R to which no timely objection is made, this Court's review is limited to a consideration of whether there is any "'clear error on the face of the record'" that precludes acceptance of the recommendations.  Wingate v. Bloomberg, 2011 WL 5106009, at *1 (S.D.N.Y. Oct. 27, 2011) (quoting Fed. R. Civ. P. 72(b) advisory committee note; citing Nelson v. Smith, 618 F. Supp. 1186, 1189 (S.D.N.Y. 1985) ("To accept the report and recommendation of a magistrate, to which no timely objection has been made, a district court need only satisfy itself that there is no clear error on the face of the record.")).

**B.      Petitions Brought Pursuant to 28 U.S.C. § 2254**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), requires a district court to give deference to state court decisions on the merits. Harrington v. Richter, 562 U.S. 86, 101 (2011) ("A state court must be granted a deference and latitude that are not in operation when the case involves [direct] review [of a criminal conviction.]").

Under Section 2254(d),

[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under Section 2254(d)(1), "'an unreasonable application of federal law is different from an incorrect application of federal law.'"  Harrington, 562 U.S. at 101 (quoting Williams v. Taylor, 529 U.S. 362, 410 (2000)) (emphasis in Williams).  "A state court's

determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Id. (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).  "Clearly established federal law 'refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision.'"  Howard v. Walker, 406 F.3d 114, 122 (2d Cir. 2005) (quoting Kennaugh v. Miller, 289 F.3d 36, 42 (2d Cir. 2002) (internal quotation marks and alterations omitted)).

## II.   ANALYSIS

### A.   Detective Berish's Testimony

In her R&R, Judge Netburn notes that

> [d]uring the trial, the prosecution [] introduced call records and cell site maps showing that over the course of July 26 and 27, 2009, Demirdjian's cell phone connected with cellular service towers in progressively more northern locations, including South Carolina, the District of Columbia, Baltimore, Philadelphia, and New York City.  An engineer from AT&T testified that a cell phone connects with a cellular service tower in the vicinity when the phone places or receives a call.  During the evening on July 27, 2009, Demirdjian's cell phone connected with a tower on 34th Street near Herald Square in Manhattan.

(R&R (Dkt. No. 41) at 4-5 (citing Trial Tr. at 441-42, 475-80))

Demirdjian objects to this description of the evidence, citing the following excerpt from Berish's testimony:  when asked whether he "'kn[ew] anything about the phone being on thirty-fourth Street [in Manhattan]'" on July 27, 2009, Berish responded, "'[n]ot at the time.'" (Pet. Obj. (Dkt. No. 48) at 4 (citing Trial Tr. at 1217-18))  There is nothing exculpatory about this line from Berish's testimony.

As Judge Netburn recounts, it was an AT&T engineer – and not Berish – who testified that Demirdjian's cell phone had connected with a tower near 34th Street in Manhattan. The Berish testimony cited by Demirdjian reflects what Demirdjian had told Berish – during the August 11, 2009 interview – about how far north he had traveled.  Demirdjian told Berish that he

had taken a bus from Orlando to Baltimore.  Berish testified, however, that he was aware of cell

site records showing that Demirdjian had travelled to a location in New Jersey about thirty

minutes from Manhattan.  (Trial Tr. at 1217-18)

In sum, the fact that Demirdjian's cell phone had "pinged" a cell tower in

Manhattan was established through the testimony of an engineer who worked for AT&T, the

cellular service provider.  See id. at 478-81.

Accordingly, this objection has no merit.

### B.   *United States v. Haymond*

In her R&R, Judge Netburn notes that "[t]he trial court sentenced Demirdjian to

an indeterminate term of 25 years' to life imprisonment for the second-degree murder conviction

and a determinate term of 15 years' imprisonment, with five years of post-release supervision,

for the weapons conviction."  (R&R (Dkt. No. 41) at 10)

Demirdjian claims that Judge Netburn erred in "fail[ing] to amend the R&R in

light of the recent decision of the United States Supreme Court" in United States v. Haymond,

139 S. Ct. 2369 (2019).  (Pet. Obj. (Dkt. No. 48) at 4)

In Haymond, the Supreme Court held that a sentence was unconstitutional where

> a judge – acting without a jury and based only on a preponderance of the evidence
> – found that [defendant] had engaged in additional conduct in violation of the
> terms of his supervised release.  Under § 3583(k), that judicial factfinding
> triggered a new punishment in the form of a prison term of at least five years and
> up to life. . . . [T]he facts the judge found here increased "the legally prescribed
> range of allowable sentences" in violation of the Fifth and Sixth Amendments.

Haymond, 139 S. Ct. at 2378.

Haymond is irrelevant here, because Demirdjian does not contend that any portion

of his sentence is attributable to a supervised release violation.

Accordingly, this objection has no merit.

### C.   <u>Motion to Suppress Text Messages</u>

Demirdjian contends that his lawyer – in not moving to suppress the text messages – provided ineffective assistance of counsel.  In rejecting Demirdjian's argument, Judge Netburn notes that he "does not describe any basis for suppressing those messages," and that "the record suggests that Demirdjian showed the text messages to police on an entirely voluntary basis. . . ."  (R&R (Dkt. No. 41) at 18-19)  "It was [thus] reasonable for the state court to conclude that trial counsel's decision not to seek suppression of the text messages fell within the wide range of reasonable professional assistance."  (<u>Id.</u> at 19)

In his objections to the R&R, Demirdjian contends that an "evidentiary hearing was required to determine whether" defense counsel was ineffective in connection with this issue.  (Pet. Obj. (Dkt. No. 48) at 4-5)

The record does not support Demirdjian's ineffective assistance of counsel claim. The state court found that "the trial testimony indicates that the defendant voluntarily showed the detectives text messages that were on his cellular phone, and that the detectives took photographs of a few of the texts with defendant's permission.  Defendant has not proffered any basis upon which a suppression motion would have been successful in suppressing the evidence."  <u>People v. Demirdjian</u>, No. 5971-09, slip op. at 4 (N.Y. Sup. Ct. Oct. 18, 2016); <u>see</u> <u>also</u> Dkt. No. 11-1 at 135.  Even now, Demirdjian does not provide any basis for suppressing the text messages. Given these circumstances, no evidentiary hearing is necessary.  <u>See</u> <u>Santone v. Fischer</u>, 689 F.3d 138, 155-56 (2d Cir. 2012) ("[Petitioner] has not presented any argument to show that an evidentiary hearing was needed with respect to the sufficiency of the evidence to support his convictions of assault in the first degree.  There is no dispute that the testimony and [] records described above were in evidence at trial. . . . [A federal habeas] court is [not] permitted to assess

the trial evidence <u>de novo</u>, or to conduct an independent factual inquiry, or to draw its own independent conclusions as to guilt or innocence.").

Accordingly, this objection has no merit.

### D.      The Prosecutor's Summation

In her R&R, Judge Netburn concludes that Demirdjian's claims regarding the prosecutor's summation were procedurally defaulted, because he made no contemporaneous objection at trial.  (R&R (Dkt. No. 41) at 15)  Judge Netburn also concludes that these claims would fail on the merits, because the summation was "well within the bounds of zealous advocacy," and "'[t]he question of whether summation commentary on a defendant's courtroom demeanor implicates constitutional rights has yet to be decided by [the Second Circuit] or by the Supreme Court.'"  (<u>Id.</u> at 16-17 (quoting <u>Maiello v. Edwards</u>, 199 F.3d 1322, 1322 (2d Cir. 1999)))  As to Demirdjian's related ineffective assistance of counsel claim – premised on counsel's failure to object to the summation – Judge Netburn reiterates that the summation constitutes fair comment on the evidence.  As to Demirdjian's contention that the prosecutor improperly remarked on his demeanor, Judge Netburn notes that "it is not clearly established that a prosecutor's comments about a defendant's courtroom demeanor constitute a constitutional violation."  (<u>Id.</u> at 18)

In his objections to the R&R, Demirdjian argues that the prosecutor's summation "so infected the [t]rial with unfairness that it made the resulting conviction a [d]enial of Due Process," and that the state court's "application of the rule is exorbitant, rendering the [s]tate ground inadequate to stop consideration of a Federal question."  (Pet. Obj. (Dkt. No. 48) at 5)

As to Demirdjian's argument that the prosecutor's description of his demeanor during summation was improper, "'[t]he question of whether summation commentary on a

defendant's courtroom demeanor implicates constitutional rights has yet to be decided by [the Second Circuit] or by the Supreme Court.'"  (R&R (Dkt. No. 41) at 17 (quoting <u>Maiello</u>, 199 F.3d at 1322))  Were this Court to find a constitutional violation premised on such conduct, it "would impermissibly fashion a 'new rule' of Constitutional law."  <u>Maiello</u>, 199 F.3d at 1322. This Court therefore agrees with Judge Netburn that "it was entirely reasonable for the state court to conclude that Demirdjian's trial counsel provided adequate professional assistance when counsel declined to object to the prosecutor's summation."  (R&R (Dkt. No. 41) at 18)

Accordingly, this objection has no merit.

**E.**     **<u>Failure to Retain a Ballistics Expert</u>**

In rejecting that portion of Demirdjian's CPL § 440.10 motion premised on his lawyer's failure to retain a ballistics expert, the trial judge noted that "Demirdjian [had] 'failed to submit an affidavit from his attorney indicating what actions he took with respect to the ballistics evidence and the reasons why he decided to proceed that way.'"  (R&R (Dkt. No. 41) at 11 (quoting <u>People v. Demirdjian</u>, No. 5971-09, slip op. at 3-4 (N.Y. Sup. Ct. Oct. 18, 2016)))  In her R&R, Judge Netburn finds that "because Demirdjian has not explained how testimony from a ballistics expert might have strengthened his defense, it is not clear that trial counsel performed inadequately by declining to consult with or hire such an expert."  (<u>Id.</u> at 18)

In his objections concerning this point, Demirdjian asserts that "[i]t is axiomatic that the outcome of the trial would have been different absent the deficient performance of [c]ounsel."  (Def. Obj. (Dkt. No. 48) at 6)  He also complains that New York law does not require the attorney's affidavit cited by the trial judge and Judge Netburn. (<u>Id.</u> at 5)

Demirdjian's objection is not persuasive.  He still does not explain how expert testimony on ballistics would have strengthened his defense.  As the trial judge stated,

Demirdjian's "position is supported only by his own self-serving statement.  [Demirdjian] failed

to submit an affidavit from his attorney indicating what actions he took with respect to the

ballistics evidence and the reasons why he decided to proceed that way.  Nor has [Demirdjian]

offered any explanation for his failure to include such an affidavit."  People v. Demirdjian, No.

5971-09, slip op. at 3-4 (N.Y. Sup. Ct. Oct. 18, 2016); see also Dkt. No. 11-1 at 134-35.

  Although Demirdjian cites cases in which courts have found that a failure to

consult an expert constituted ineffective assistance of counsel (Pet. Reply Br. (Dkt. No. 35) at

16-20)), he does not explain how his case is factually analogous, nor does he articulate how a

ballistics expert might have affected the outcome of his case.  Given Demirdjian's continued

failure to provide specifics – in his direct appeal, his CPL §440.10 motion, his federal habeas

petition, and continuing through the instant objections to the R&R – this Court agrees with Judge

Netburn that "[t]he state courts' rejections of Demirdjian's ineffective assistance of trial counsel

claims were reasonable applications of Strickland."  (R&R (Dkt. No. 41) at 18)

  Finally, with respect to Demirdjian's argument that no attorney's affidavit was

required (Def. Obj. (Dkt. No. 48) at 5 (citing People v. Radcliffe, 298 A.D.2d 533 (2d Dept.

2002))), Demirdjian's reliance on Radcliffe is misplaced.  In Radcliffe, defendant "claim[ed] that

his trial counsel was ineffective for failing to inform him of a pretrial offer of a sentence of two

to four years incarceration in exchange for a plea of guilty."  Radcliffe, 298 A.D.2d at 534.  The

court found that "[t]o require the defendant to secure an [attorney's] affidavit, or explain his

failure to do so, is wasteful and unnecessary."  Id.  The issue here is not comparable.  While

Radcliffe's counsel was obligated to convey all plea offers to Radcliffe, here Demirdjian's

lawyer could have had valid strategic reasons for not retaining a ballistics expert.  Given these

circumstances – and Demirdjian's failure to explain how the retention of a ballistics expert

would have helped his case – the state court was entitled to understand trial counsel's reasons for not retaining a ballistics expert.  Demirdjian's failure to obtain an affidavit from his trial counsel was thus properly cited by the state court judge.

Accordingly, this objection has no merit.

F. **Leave to Amend**

In her R&R, Judge Netburn recommends that Demirdjian's request to supplement the Petition with three additional claims be denied, because the proposed amendments would be futile.  (R&R (Dkt. No. 41) at 22)  Demirdjian objects to this recommendation.  (Def. Obj. (Dkt. No. 48) at 7)

As to Demirdjian's fraud on the court claim, Judge Netburn finds that Demirdjian "has not explained how Respondent's description of the facts is inaccurate or misleading.  Nor has he presented any evidence to suggest that Respondent's version of the facts prevents the judicial system from functioning in its usual manner."  (R&R (Dkt. No. 41) at 21)  As to Demirdjian's Brady claim – which is premised on a report that Demirdjian himself made to the police on July 25, 2009 – Judge Netburn found that this claim was not exhausted, and in any event was meritless, because Demirdjian "was fully aware of the essential facts permitting him to take advantage of this evidence."  (Id.)  Judge Netburn also rejected Demirdjian's actual innocence claim, noting that such a claim only "'allow[s] a petitioner to have his accompanying constitutional claims heard despite a procedural bar.'"  (Id. at 22 (quoting Rivas v. Fischer, 687 F.3d 514, 540 (2d Cir. 2012)))

As Judge Netburn correctly states, "a district court 'may properly deny leave when amendment would be futile.'"  (Id. at 20 (quoting Pierre v. Ercole, 607 F. Supp. 2d 605, 607 (S.D.N.Y. 2009)))

Leave to amend is properly denied as to Demirdjian's proposed fraud on the court claim, because any such claim would be futile. As Judge Netburn notes, the bar for such a claim is quite high: "'[f]raud upon the court should embrace only that species of fraud which does or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases.'" (Id. (quoting King v. First Am. Investigations, Inc., 287 F.3d 91, 95 (2d Cir. 2002))) Demirdjian does not explain "how Respondent's description of the facts is inaccurate or misleading." (Id. at 21) Indeed, in his objections, Demirdjian still does not offer any evidence suggesting that Respondent has misled the Court. Accordingly, Judge Netburn correctly concluded that the fraud on the court claim has no merit.

As to his actual innocence claim, Demirdjian appears to argue that Judge Netburn erred in concluding that his claim was time-barred. (Def. Obj. (Dkt. No. 48) at 8 (quoting R&R (Dkt. No. 41) at 22)) Judge Netburn made no finding that this claim was time-barred, however. Instead, Judge Netburn found that Demirdjian "has not demonstrated that any of his constitutional claims are meritorious. Thus, even if Demirdjian could meet the demanding standard of a gateway showing of actual innocence, there would be no constitutional grounds upon which to grant relief." (R&R (Dkt. No. 41) at 22) Judge Netburn's conclusion accurately reflects controlling law holding that, "'in rare cases, an assertion of innocence may allow a petitioner to have his accompanying constitutional claims heard despite a procedural bar.'" (Id. (quoting Rivas v. Fischer, 687 F.3d 514, 540 (2d Cir. 2012))) For the reasons already discussed, Judge Netburn correctly concluded that none of Demirdjian's constitutional claims have merit. It necessarily follows that his actual innocence claim has no merit.

In a July 18, 2019 letter submitted after Judge Netburn had issued her April 26, 2018 R&R, Demirdjian submitted "newly discovered evidence . . . [s]howing that [he] was not in possession of the victim's keys at the time of the murder." (July 18, 2019 Pet. Ltr. (Dkt. No. 45) at 1) In his letter, Demirdjian quotes a portion of the prosecutor's summation, in which the prosecutor notes that Morganstern's mother

> knew that her keys were missing. She doesn't know necessarily the ins and out[s]. Maybe is mistaken about a lot of the details, I concede that. But what stood out in her mind and what was important to her is that her daughter's keys were missing after a trip to Florida. And she's not the type of person who can come up with a lie to say on the stand in order to make something up, to know the significance of it. She just knows that the daughter's keys were missing. And it's important. Because where was the victim in July? In Florida, with the defendant. So he clearly had access. This was clearly his plan.

(Trial Tr. at 1359-60)

With his July 18, 2019 letter, Demirdjian also submits a January 2, 2018 letter from the Sheriff of Orange County, Florida, enclosing "a portion of Detective [Brian] Cross'[s] investigative report in reference to keys observed during the October 30, 2009 search warrant." (July 18, 2019 Pet. Ltr. (Dkt. No. 45) at 5) Cross's report, in relevant part, reads as follows:

> On November 20, 2009, I met with Detectives Adorno and Hall at the Orange County Sheriff's Office. They advised during their investigation they learned the victim's key were missing. A set of keys were observed on a table during the October 30, 2009 search warrant. They keys were not recovered at that time. Probable cause was established to execute a second search warrant at the aforementioned residence . . . [which] was executed on November 20, 2009. . . . Patrick Brown responded to the location with the key to unlock the door. Detectives Adorno and Hall were present during the search warrant. They keys were not recovered during the search warrant.

(Id. at 6-7)

As an initial matter, Demirdjian's conviction was not substantially premised on his alleged possession of Morganstern's keys at the time of her murder. But more importantly, Cross's report does not establish that Demirdjian was not in possession of those keys at the time

of the murder.  Cross's report only demonstrates that when police returned to Demirdjian's residence on November 20, 2009 – three weeks after the original search warrant was executed – the keys were not in his apartment.

To the extent that Demirdjian seeks to amend the Petition to add a claim premised on Cross's investigative report, his application will be denied on the grounds that any such amendment would be futile.

This Court has reviewed the remainder of Judge Netburn's R&R and finds it to be well-reasoned and free of error.

## <u>CONCLUSION</u>

For the reasons stated above, the R&R is adopted in its entirety, and Demirdjian's Section 2254 petition is denied.  Demirdjian's request to supplement his original petition with additional claims is denied.

A certificate of appealability will not issue, because Demirdjian has not "made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c).  Where, as here, "a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward:  The Petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).  Demirdjian has made no such showing here.

The Clerk of Court is directed to close this case.

Copies mailed by Chambers.

Dated: New York, New York
       October 6, 2020

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge